MARRI DERBY (107209)
marri@marriderbylaw.com
23 Corporate Plaza Dr., Ste 150
Newport Beach, CA 92660
Telephone: (949) 478-5084
Fax: (949) 608-7034

*Attorney for Defendant TYRONE RYE*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: 8:11-CR-00148-JVS |
| *Plaintiff,* | ) |
| | ) **NOTICE OF MOTION AND** |
| | ) **MOTION TO DISCLOSE GRAND** |
| v. | ) **JURY MATERIALS;** |
| | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES; DECLARTION** |
| TYRONE RYE | ) **OF MARRI DERBY** |
| *Defendant.* | ) |
| | ) Date:  June 24, 2014 |
| | ) Time:  3:00 p.m. |
| | ) Judge:  Hon. James V. Selna |

PLEASE TAKE NOTICE that on June 24, 2014 at 3:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 10C, before the Honorable James V. Selna, United States District Judge for the Central District of California, Defendant TYRONE RYE, by and through his attorney of record, Marri Derby, will move and hereby does move the Court for an order to disclose the following grand jury materials:

1.  Transcripts of the witnesses who testified who are either informants or members of the SAGTF;

2. Instructions, prosecution argument or other commentary provided to the grand jury regarding the charges;

3. Documents or statements provided by the United States Attorney's Office to the grand jury regarding criminal histories of informants who testified or were relied upon by experts or witnesses of the SAGTF.

Dated: May 27, 2014                    Respectfully submitted,

_____/S/_____

MARRI DERBY
Attorney for Defendant
TYRONE RYE

Motion to Disclose Grand Jury Materials

## TABLE OF CONTENTS

I.  INTRODUCTION……………………………………………………………..  5

II. STATEMENT OF FACTS……………………………………………………  5

III. POINTS AND AUTHORITES AND ARGUMENT……………………………  8

    1. THE MATERIAL SOUGHT IS NEEDED TO AVOID A POSSIBLE

INJUSTICE ……………………………………………………………………  9

    a.)    It is Possible That: Perjured Testimony Was Offered to the Grand Jury;

Exculpatory Evidence Was Ommitted; Brady and Massiah Violations Occurred……  11

    b.)    Failure to Disclose Backgrounds of Informants and Benefits Given to

Informants is Sufficient Grounds to Dismiss the Indictment…………………………. 21

    2. THE NEED FOR DISCLOSURE OUTWEIGHS THE NEED FOR

SECRECY……………………………………………………………………….. 22

    3. THIS REQUEST IS STRUCTURED TO COVER ONLY THE MATERIALS

NEEDED………………………………………………………………………… 22


IV. CONCLUSION…………………………………………………………… 23

V.  DECLARTION OF MARRI DERBY……………………………………….. 24

## <u>TABLE OF AUTHORITIES</u>

*Brady v. Maryland* (1963) 373 U.S. 83 …………………………………………….. 7, 14

*Massiah v. United States* (1964) 377 US 201…………………………………….. 7

Fed. R. Crim. P. 6(e)(3)(E)(i)(ii)……………………………………………… 8

*Douglas Oil Co.* v. *Petrol Stops Northwest* (1979) 441 U.S. 211……..…………  8, 9, 22

*Branzberg v. Hayes*, (1972) 408 U.S. 665 ………………………………………... 9

*Dennis v. United States*, (1966) 384 U.S. 855 ………………………………….… 9

*United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) …………………………… 10

*United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) ………………………… 10

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct 2369, 2376 (1988) …… 10

*United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir.) cert. denied,

 434 U.S. 823 (1977) ………………………………………………………………10

*United States v. DeRosa*, 783 F.2d 1401, 1405 (9th Cir.), cert. denied,

477 U.S. 908 (1986)………………………………………………………… 10

*United States v. Sears, Roebuck & Co., Inc*., 719 F.2d 1386, 1392 (9th Cir. 1983)..11, 22

*United States. v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir. 1977)……………………  11

*United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974) …………………………  11

*United States v. Isgro,* 751 F.Supp. 846, 850 (C.D. Cal.1990)………………………… 11

National Youth Gang Center, U.S. Dept. of Justice, Gang Prosecution Manual,

July 2009……………………………………………………………………….. 14

Motion to Disclose Grand Jury Materials

*United States v. Mechanik*, 475 U.S. 66 (1986) …………………………………... 23

*United States v. Dederich*, 825 F.2d 1317 (9th Cir. 1987)…………………………... 23

*United States v. Benjamin,* 812 F.2d 548 (9th Cir. 1987)……………………………..  23

# I.

## INTRODUCTION

Tyrone Rye is one of twenty-eight defendants charged in a three-count indictment. Count 1 charges all defendants with conspiring to participate in affairs of an enterprise (*i.e.*, "the Orange County ('OC') Mexican Mafia") through a pattern of racketeering consisting of murder, extortion and narcotics trafficking, in violation of 18 U.S.C. § 1962(d). (Ind. 10-11). Count 2 charges Armando Moreno, Ernie Melendez and John Gaona with conspiring to murder "those individuals supporting defendant OJEDA's leadership position in the OC Mexican Mafia, including" defendants Ojeda, Donald Aguilar, Jacobo Huanosto, Thomas Rodriguez, Tyrone Rye, Joseph Lara and Omar Briseno, for the purpose of gaining entrance to and maintaining and increasing their position in the OC Mexican Mafia, in violation of 18 U.S.C. § 1959(a)(5). (Ind. 37-38). Count 3 charges Ojeda, Huanosto, Rodriguez, Rye and Lara with conspiring to murder "those individuals supporting defendant MORENO's leadership position in the OC Mexican Mafia, including" Moreno, Melendez and Gaona, for the purpose of gaining entrance to and maintaining and increasing their position in the OC Mexican Mafia, in violation of 18 U.S.C. § 1959(a)(5). (Ind. 39-40). Ojeda and eighteen codefendants have pleaded not guilty, and trial is set for October 29, 2014.  For the reasons discussed below, the Court should order the Government to disclose the requested Grand Jury materials.

## II.

## STATEMENT OF FACTS

The investigation in this matter began sometime in 2008, when the Santa Ana Gang Task Force (SAGTF) initiated a multiagency effort entitled "Operation Black Flag" aimed at weakening the Mexican Mafia's control of local jails and their influence over local gangs.  The SAGTF was comprised of several local, state and federal agencies, including the Orange County District Attorney (OCDA), the Orange County Sheriff's Office (OCSO), the Santa Ana Police Department, the FBI, and the United States Attorney's Office.  The SAGTF allege that prior to April 2009, defendant Peter Ojeda (OJEDA) controlled Orange County jails and street gangs through his status with the Mexican Mafia. They allege that in April 2009, defendant Armando Moreno (MORENO) tried to usurp OJEDA'S control, causing a violent "split" between the factions of the Mexican Mafia. Allegedly, supporters of MORENO carried out orders to assault or kill supporters of OJEDA and vise-versa.  The "orders" were transmitted in the jails by "kites", small notes passed between inmates.  During the Black Flag investigation, the SAGTF relied heavily upon informants, both custodial and non-custodial.  They used the informants to translate the "kites" and to obtain information from inmates.  The informants were under the supervision of "Special Handling Deputies" who reported to the SAGTF.  The AUSA who was supervising the Black Flag investigation and the federal indictment was ex-AUSA, now Superior Court Judge, Terry Flynn (FLYNN). The Black Flag investigation resulted in the OCDA charging 26 defendants with conspiracies to commit "murder and/or assault at the direction of a Hispanic California prison gang";[1] and the indictment of the 28 defendants before this court.

In January of this year, the Orange County Public Defender's Office, filed a 507 page (with approximately 22,000 pages of exhibits) motion to dismiss the death penalty in

---

[1] Press Release by OCDA, *26 Charged with Conspiracies to Commit Murder and/or Assaults at the Direction of Hispanic California Prison Gangs*, July 13, 2011, attached as Exhibit A.

Motion to Disclose Grand Jury Materials

People v. Scott Dekraai (DEKRAAI).[2]  The motion alleges that DEKRAAI'S state and federal constitutional rights to counsel, a fair trial, and due process were violated due to outrageous governmental misconduct engaged in by the prosecution and law enforcement. The outrageous misconduct was allegedly committed by several witnesses involved in the Black Flag investigation, including members of the SAGTF.

DEKRAAI alleges that the SAGTF repeatedly committed *BRADY* (*Brady v. Maryland* (1963) 373 U.S. 83) and *MASSIAH* (*Massiah v. United States* (1964) 377 US 201) violations, by essentially deputizing informants and having them troll the jails for information.  Special Handling Deputies would house informants next to targeted inmates (inmates who were represented by counsel) in order to elicit incriminating information. These informants (particularly two informants, Fernando Perez (PEREZ) and Oscar Moriel (MORIEL)) took hundreds of pages of notes which were not turned over to defense counsel in several cases where the informants testified. The benefits bestowed upon the informants were also not disclosed.  DEKRAAI further alleges that both PEREZ and MORIEL would say anything to get a reduced sentence, were dishonest, and that MORIEL committed perjury during his testimony.  DEKRAAI further alleges that several members of the SAGTF (including Seth TUNSTALL, David RONDOU, Ben GARCIA, and Gonzalo GALLARDO) failed to follow policy of the Department of Justice, lied, and manipulated evidence to make it appear that the informants contact with targeted inmates was "coincidental".  PEREZ, MORIEL, TUNSTALL, RONDOU, GARCIA, and GALLARDO, are instrumental witnesses (repeatedly mentioned throughout the discovery) in this matter and affect all of the 28 defendants in this indictment. Several of the defendants in this case, including RYE, are mentioned in the DEKRAAI motion.[3]

---

[2] A copy of the face page of the motion is attached as Exhibit B.

[3] For example, pages 77-78 of the DEKRAAI motion are attached as Exhibit C.  Note that Inmate F is PEREZ.  The court initially granted the prosecution's motion to prevent disclosure of his name, but later ordered disclosure.

Motion to Disclose Grand Jury Materials

DEKRAAI further alleges that District Attorney Erik Petersen (PETERSEN) and other district attorneys were aware of the *Massiah* violations and committed *Brady* error by not turning over information relating to the informants.

Judge Thomas Goethals of the Orange County Superior Court is presiding over DEKRAAI.  Hearings regarding the motion have been on-going since January 31st.  On March 18, 2014 testimony began on the DEKRAAI motion.  Over thirty days of testimony have been taken thus far. Several witnesses have testified, including all of the above witnesses plus several Orange County District Attorneys.  DEKRAAI's Defense counsel announced on May 21, 2014 the intention to call FLYNN.  On May 27th (the date of the filing of this motion) DEKRAAI informed the court "they did subpoena Judge Terri Flynn-Peister [FLYNN] and now the U.S. Attorney's Office is requesting the subpoena go through their office and will need a week to respond to defense subpoena". The court noted this information. As of today (the 27th of May) testimony is continuing to be heard.[4]

### III.

### MEMORANDUM OF POINTS AND AUTHORITES

Fed. R. Crim. P. 6(e)(3)(E)(i)(ii) states:

The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:

(i) preliminarily to or in connection with a judicial proceeding;

(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.

The Rule thus provides the court with discretion to order the disclosure of grand jury materials where such disclosure may support a motion to dismiss the Indictment. Additionally, disclosure is appropriate if a defendant shows a particularized need for such

---

[4] A copy of the "Register of Actions" (docket report) of DEKRAAI is attached as Exhibit D.

disclosure. *Douglas Oil Co.* v. *Petrol Stops Northwest,* 441 U.S. 211, 218 (1979). Defendant is not required to meet a certain quantum of proof. Defendant must demonstrate that (1) the material sought "is needed to avoid a possible injustice"; (2) "the need for disclosure is greater than the need for continued secrecy"; and (3) the request "is structured to cover only materials so needed". *Douglas Oil*, 441 U.S. at 222. While the burden is on the moving party to establish such a particularized need, the burden is significantly lessened when the grand jury's work has been concluded. *Douglas Oil Co.,* 441 U.S. at 211.  In applying this test, the court must balance two competing interests: the need for disclosure and the need for continued secrecy. *Id*. at 222.

A possible abuse of the grand jury process weighs heavily toward disclosure. The risk that a defendant's Fifth Amendment right to indictment by grand jury has been undermined is a grave one. The grand jury serves "the dual function of determining if there is probable cause . . . and of protecting citizens against unfounded criminal prosecution". *Branzberg v. Hayes*, 408 U.S. 665, 686-87 (1972). At issue here is more than simply defendant RYE's due process right, but the integrity of the grand jury process.

The interests in secrecy are measurably reduced after the grand jury completes its investigation.  "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification".  *Douglas Oil*, 441 U.S. at 223.  "In a variety of circumstances, the lower federal courts, too, have made grand jury testimony available to defendants. [Footnote] These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, (1966) 384 U.S. 855 at 870. "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. [Footnote] Exceptions to this are justifiable only by the clearest and most compelling considerations." *Id* at 873.

9

Motion to Disclose Grand Jury Materials

## 1.  THE MATERIAL SOUGHT IS NEEDED TO AVOID A POSSIBLE INJUSTICE

RYE seeks the following grand jury materials:  The transcripts of witnesses who were either part of the SAGTF or an informant; any documentary evidence produced regarding these witnesses testimony; and the argument and or commentary made to the grand jury by the Government. This material is necessary because it is possible that misleading and possibly perjured testimony was elicited; that exculpatory evidence was omitted; and *Brady* and *Massiah* violations occurred denying defendant due process.

The Ninth Circuit has repeatedly approved use of the District Court's supervisory power to dismiss an indictment for governmental misconduct."[S]uch dismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature." See *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) and (cases cited).Governmental "misbehavior, even if unintentional, can cause improper influence and usurpation of the grand jury's role". *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979). This Court's inquiry focuses on whether the government's conduct was "a significant infringement on the grand jury's ability to exercise independent judgment." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct 2369, 2376 (1988) Where dismissal is sought for non-constitutional error, such as governmental misconduct, "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id*. at 2374.

This inquiry is consonant with the Court's traditional goal "to protect the integrity of the judicial process, particularly the functions of the grand jury, from unfair or improper misconduct". *United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir.) cert. denied, 434 U.S. 823 (1977). The court directs its inquiry toward the effect of any misinformation

given the grand jury, not the prosecutorial conduct. *United States v. DeRosa*, 783 F.2d 1401, 1405 (9th Cir.), cert. denied, 477 U.S. 908 (1986).

      If the prosecution not only failed to present exculpatory evidence to the grand jury, but also mislead them into believing that no such evidence existed, then the prosecution has undermined the independence of the grand jury in making an informed determination of probable cause. See *United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1392 (9th Cir. 1983).

      There is no question that a prosecutor's knowing use of false testimony under oath before a grand jury is sufficient grounds for dismissal of an indictment. *United States. v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir. 1977); *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). As one district court noted,

      "[T]he Supreme Court and other federal courts, including those in the Ninth Circuit, have been concerned on occasion with possible usurpation of the function of the Grand Jury by the prosecution. The fear is that a Grand Jury sufficiently controlled by the Government thus becomes a kind of "rubber stamp" for the wishes of the prosecutor. The Fifth Amendment Due Process clause of the constitution guarantees citizens who are to be charged with serious crimes in the federal courts the right to have their cases screened by a Grand Jury of their fellow citizens before being put on trial. If the presentation to the Grand Jury is done unfairly and essential information is withheld, the Grand Jury is thus unable to make a decision based on a fair assessment of the evidence. Then the indictment in fact becomes the decision of the prosecutor and not of the Grand Jury, thereby causing fundamental unfairness and a violation of a defendant's constitutional rights." *United States v. Isgro,* 751 F.Supp. 846, 850 (C.D. Cal.1990).

      **a.) It is Possible That: Perjured Testimony Was Offered to the Grand Jury; Exculpatory Evidence Was Ommitted; *Brady* and *Massiah* Violations Occurred**

11

Motion to Disclose Grand Jury Materials

DEKRAAI raises several issues regarding Black Flag witnesses: that they lied and committed perjury; that SAGTF witnesses omitted exculpatory evidence creating *Brady* violations; and that SAGTF witnesses violated *Massiah* by housing informants next to inmates who were represented by counsel in order to elicit incriminating statements. The witnesses include informants PEREZ and MORIEL, and SAGTF witnesses RONDOU, TUNSTALL, GARCIA and GALLARDO (all witnesses in this case). Additionally, OCDA's WAGNER and PETERSEN, during their testimony in the DEKRAAI matter, blame the federal government and FLYNN for the *Brady* and *Massiah* violations.

Defendant RYE has reason to believe there is substance to the allegations in part by reviewing the DEKRAAI motion and by reviewing the testimony of Supervising OCDA Dan Wagner (WAGNER).  WAGNER testified on March 24, 25, and 26, 2014. WAGNER testified at various points that he interviewed or spoke to the above witnesses regarding the allegations made in DEKRAAI.  He offers weak defenses for both the witnesses and for many of the allegations.  In fact at one point he concedes that several of the allegations have merit and that the OCDA will be providing evidence for potential habeas' for several defendants.

For example, on March 24th Deputy Public Defender Sanders asked the following questions of WAGNER about some of the allegations made by DEKRAAI regarding RONDOU:

Q. THERE WAS A LOT OF -- WOULD YOU AGREE IN THE MOTION THERE'S A LOT OF DISCUSSIONS ABOUT DETECTIVE RONDOU AND HIS CONDUCT? CORRECT?

A. I GUESS SO.

Q. WELL, HE'S PART OF THE PALACIOS CASE, HE'S PART OF MORIEL, HE'S PART OF VEGA. HE'S THE INVESTIGATING OFFICER IN EACH ONE OF THOSE CASES. RIGHT?

A. WELL, MORIEL WASN'T A CASE.

Q. I'M SORRY, YES.

A. SO YOU HAVE PALACIOS AND VEGA AND I GUESS YOU'RE  SAYING RICKY LOPEZ. OKAY.

Q. THERE'S A NUMBER OF ALLEGATIONS ABOUT HIM COMMITTING PERJURY IN TRIAL. DO YOU REMEMBER THAT?

A. YES. AND I AM TRYING TO REMEMBER WHAT IT WAS THAT WAS ALLEGED TO BE PERJURIOUS, AND I CAN'T RECALL.

Q. THE ONE WE TALKED ABOUT BEFORE IN PEOPLE VERSUS VEGA, THE ATTORNEY FOR THE DEFENSE, ROB HARLEY, INDICATED THAT HE WASN'T TESTIFYING –

A. OH, WASN'T RECORDING?

Q. RONDOU TALKS ABOUT HOW HE'S A TEACHER; YOU MUST RECORD IN EVERY SINGLE INSTANCE. YOU MUST RECORD. DO YOU REMEMBER THAT?

A. YEAH, RIGHT.

Q. THAT CONCERNED YOU. RIGHT?

A. I WASN'T QUITE SURE WHAT TO MAKE OF THAT. I THINK SOMETIMES THERE'S HYPERBOLE THAT'S USED AND IT'S UNDERSTOOD TO BE THAT. (Pages 47-48 of Reporter's Transcripts.)[5]

In the following testimony, WAGNER is asked if he has concluded whether SAGTF members engaged in conduct that was improper:

Q. AND THEN WITH REGARD TO THE MEMBERS OF LAW ENFORCEMENT THAT ARE DISCUSSED WITHIN THE MOTION – AND JUST TO KIND OF REITERATE THAT GROUP AND HOPEFULLY I'LL BE COMPLETE ABOUT IT -- DETECTIVE RONDOU, DETECTIVE MC LEOD, DETECTIVE -- FORMER DETECTIVE CASTILLO, DEPUTY BEN GARCIA FROM THE SHERIFF'S DEPARTMENT, DEPUTY SETH TUNSTALL FROM THE SHERIFF'S DEPARTMENT, THE MEMBERS OF THE PROSECUTION TEAM THAT ARE -- THAT HAVE INVESTIGATED THIS CASE, HAVE YOU MADE ANY RECOMMENDATION OR INDICATED IN ANY WAY THAT YOU BELIEVE THAT THOSE INDIVIDUALS ENGAGED IN ANY CONDUCT THAT WAS IMPROPER?

A. I HAVEN'T COME TO A CONCLUSION ON THAT.

---

[5] A copy of the March 24th reporter's transcripts is attached as Exhibit E.

Q. ARE YOU -- HAVE YOU -- HAVE YOU INDICATED TO ANYBODY THAT YOU BELIEVE -- YOU HAVE SUSPICIONS ABOUT THAT?

A. I'M NOT SURE IF I HAVE. (Pages 15-16 of Reporters Transcripts dated March 25, 2014.)[6]

Defendant RYE also has reason to believe that the SAGTF and AUSA FLYNN failed to follow DOJ protocol put in place to ensure the due process protections mandated by the United States Constitution, *Brady* and *Massiah* are followed. The United States Department of Justice's *Gang Prosecution Manual* contains a chapter that articulates the fundamental principles of an ethical and successful informant program:

"Police and prosecutors should carefully log all benefits conferred on a CI during an investigation and disclose the benefits before trial to the defense. Such benefits are viewed legally as motivation for a CI to favor law enforcement while testifying. Great care must also be given to disclosing to the defense any exculpatory *Brady* material that might be discovered as a result of the Cl's cooperation, *Brady v. Maryland*, 373 U.S. 83 (1963). CIs should only be used after a written agreement is signed that fully discloses the agreement between the CI and the police (in conjunction with the prosecution). Police should also maintain a log of all supervision of and direction given to a CI and document the performance of the Cl, both good and bad. It is critical to present the CI in the most accurate light possible to avoid the appearance that the police and prosecution are hiding things."

(National Youth Gang Center, U.S. Dept. of Justice, Gang Prosecution Manual, July 2009).

---

[6] A copy of the reporters transcripts dated March 25, is attached as exhibit F.

Motion to Disclose Grand Jury Materials

The following colloquy between counsel for DEKRAAI and WAGNER during the testimony on the 24th demonstrates why it is possible to believe that *Brady* and *Massiah* violations exist and that the above procedures mandated by the DOJ were not followed:

Q. YOU DID -- THERE WAS A BRIEF INTERVIEW THAT YOU DID I THINK WITH TUNSTALL AND GARCIA IN WHICH THEY INDICATED "WE DON'T HAVE THE NOTE WITHIN OUR FILE FROM 5-24." DO YOU REMEMBER THAT?

A. YEAH, I'M PRETTY SURE.

Q. BUT DID YOU -- DID THAT STRIKE YOU AS UNUSUAL BECAUSE THAT'S SPECIAL HANDLING AND THEY'RE THE FOLKS WHO RECEIVE THE NOTE AND THEY'RE TELLING YOU THAT NOTE IS NOT IN OSCAR MORIEL'S FILE?

A. YEAH.

Q. THAT WAS AN ISSUE THAT WE RAISED THAT WOULD SEEM SO UNUSUAL THAT, WHEN YOU CROSS-CHECK THE MATERIALS, THE NOTE AT LEAST DID NOT APPEAR TO BE IN OUR VERSION --

A. RIGHT.

Q. -- OF THE MATERIAL. DID THAT RAISE A CONCERN FOR YOU WITH REGARD TO HOW SPECIAL HANDLING IS ABLE TO KEEP MATERIALS TOGETHER AND WHETHER THEY HAVE ALL THE MATERIALS IN THE FILE?

A. YES.

Q. AND WHAT STEPS HAVE YOU TAKEN SINCE LEARNING THAT?

A. WE'VE TALKED TO BEN GARCIA AND SETH TUNSTALL AND ASKED THEM QUESTIONS ABOUT THAT.

Q. AND WERE THE ANSWERS SATISFACTORY TO YOU?

A. IN THE SENSE THAT I DIDN'T THINK THEY WERE LYING?

Q. OKAY.

A. BUT I MEAN THEIR ANSWER WAS "WE DON'T KNOW."

Q. ALL RIGHT.

A. IT SHOULD BE BUT IT'S NOT. "WE DON'T KNOW." Page 43-44 of Exhibit E.

Motion to Disclose Grand Jury Materials

The following colloquy shows why it is possible to believe potential *Massiah* violations occurred:

> Q.  YOU KNOW IN THE CONTEXT OF THE MOTION I MAKE SOME ALLEGATIONS THAT IT APPEARS AT LEAST THAT THE CONTACT BETWEEN FERNANDO PEREZ AND ISAAC PALACIOS AT LEAST AT SOME POINT DURING THE RELATIONSHIP APPEARS TO BE DIRECTED BY EITHER THE SPECIAL HANDLING UNIT OR THE SANTA ANA POLICE DEPARTMENT OR IN COMBINATION?
>
> A.  I UNDERSTAND YOUR SUSPICIONS IN THAT REGARD.
>
> Q. DO YOU THINK THOSE SUSPICIONS ARE UNFOUNDED?
>
> A. I DON'T KNOW THAT THEY'RE FOUNDED OR UNFOUNDED.
>
> Q. IS IT SOMETHING THAT YOU'VE TAKEN A LOOK AT BECAUSE OF THE SERIOUSNESS OF IT? IT IN SOME WAYS MIRRORS THIS CASE [DEKRAAI], AS MR. PETERSEN SAID. IT'S ONE OF THE QUESTIONS OF WHETHER AN INMATE WAS PLACED IN A CLOSE LOCATION TO A REPRESENTED DEFENDANT IN ORDER TO OBTAIN STATEMENTS. HAVE YOU LOOKED INTO THAT?
>
> A. YES.
>
> Q. AND WHAT -- AND WHO HAVE YOU SPOKEN TO ABOUT THAT?
>
> A. I WOULD SAY BEN GARCIA, SETH TUNSTALL, ERIK PETERSEN, DAVE RONDOU. THOSE COME TO MIND.  Pages 38-39 of Exhibit E.

The following colloquy about WAGNER's interviews with other supervisor's (the "5's") of PETERSEN regarding potential discovery violations provides reason to believe potential Due Process violations exist:

> Q. SO THEY SPOKE TO HIM [PETERSEN] ABOUT -- ONE OF YOU SPOKE TO HIM ABOUT PALACIOS. CORRECT?
>
> A. YEAH. YOU KNOW, I'M -- I'M GETTING UNCOMFORTABLE THAT I CAN'T BOOT UP A MEMORY OF A CONVERSATION WITH ALL THE 5'S AND PETERSEN. SO I'M NOT COMING UP -- I FEEL UNCOMFORTABLE GIVING

DETAIL RIGHT NOW ABOUT THAT BECAUSE I'M NOT SURE THAT I KNOW THAT I HAVE A GOOD ENOUGH RECOLLECTION TO REALLY --

Q. DO YOU REMEMBER ANY OF HIS RESPONSES TO ANY QUESTIONS?

A. SO -- YES, BUT TO PLACE IT IN A PARTICULAR CONVERSATION IN A CONTEXT OF WHO WAS THERE AND QUESTIONING HIM IS DIFFICULT. SO I MEAN I RECALL HIM SAYING THAT HE'S IN A POSITION WHERE THE FEDERAL TASK FORCE DOESN'T GIVE HIM ACCESS TO THEIR FILES AND THEY GIVE HIM PARTICULAR MATERIALS AND THAT'S ALL HE GETS, AND THEN HE TURNS ALL THAT OVER TO THE DEFENSE ATTORNEY. HE'S NOT SAYING – BUT AS HE'S SAYING THIS, I'M THINKING YOU'RE PUTTING YOURSELF IN NO MAN'S LAND AND YOU CAN'T PUT YOURSELF IN THAT SITUATION.

Q. BUT WHY DID -- WHY WOULD YOU HAVE FOUND THAT CREDIBLE? YOU KNEW, FOR EXAMPLE, FROM THE DISCOVERY THAT YOU HAD TURNED OVER TO US THAT IN CAMARILLO THERE WERE 129 PAGES OF NOTES REGARDING OSCAR MORIEL YET IN PEOPLE VERSUS VEGA HE TURNED OVER FOUR PAGES. WHY AS HE WAS GIVING THAT RESPONSE DIDN'T YOU JUST SAY, "LOOK, MR. PETERSEN, ERIK," WHATEVER YOU CALL HIM INFORMALLY, "I DON'T UNDERSTAND HOW THAT WOULD EXPLAIN WHY YOU TURNED OVER SO LITTLE IN THE PEOPLE VERSUS VEGA CASE"?

A. AND YOUR QUESTION WAS?

Q. DID YOU ASK HIM ABOUT THAT? "I GOT YOUR ANSWER --MR. PETERSEN, I UNDERSTAND YOUR ANSWER ABOUT THE DILEMMA THAT'S CREATED BY THE SANTA ANA GANG TASK FORCE BUT THAT HAS NOTHING TO DO WITH WHY YOU TURNED OVER FOUR PAGES IN THE VEGA CASE."

A. SO DID I ASK HIM THAT OR WAS THAT HIS RESPONSE OR --

Q. YEAH. DID YOU ASK HIM? DID YOU FOLLOW UP. HE HAD GIVEN YOU AN ANSWER. IT WAS HIS ANSWER FOR WHY HE HAD NOT GIVEN CERTAIN AMOUNTS OF DISCOVERY. BUT YOU KNEW BECAUSE YOU HAD TURNED OVER DISCOVERY IN THIS CASE AND YOU HAD READ THE MOTION THAT IN OTHER CASES HE HAD TURNED OVER MUCH LARGER QUANTITIES OF MATERIAL.

A. WELL, I KNEW THAT FROM YOUR MOTION.

Q. OKAY. SO --

A. FRANKLY, I HAD NOT READ THAT [PEREZ] MATERIAL. I WAS NOT ABLE TO READ ALL THAT WHEN WE WERE TURNING THAT OVER SO IT WASN'T UNTIL YOUR MOTION THAT I -- THAT THAT REALLY CAME TO MY CONSCIOUSNESS.

Q. BUT YOU'RE INTERVIEWING HIM AFTER YOU'VE READ THE MOTION. SO ONCE YOU'VE READ THE MOTION, YOU KNOW I TALKED ABOUT THE MOTION AND THE DISCOVERY RELATING TO INMATE E AND SPECIFICALLY WHY THERE WAS THIS HUGE DISCREPANCY BETWEEN ALL OF THIS DISCOVERY IN THE MORIEL CASE -- I'M SORRY – IN THE INMATE E CASE --

A. RIGHT.

Q. -- AND NOTHING IN THE MORIEL CASE.

A. THERE IS A DISCREPANCY.

Q. SO YOU KNEW THAT AT THE TIME THAT YOU WERE ACTUALLY QUESTIONING ERIK PETERSEN ABOUT THAT. YOU AT LEAST KNEW THAT THE ALLEGATIONS WERE MADE SUCH THAT YOU COULD ASK QUESTIONS OF HIM ABOUT IT.

A. SOME LEVEL, YES.

Q. WELL, DID YOU?

A. DID I KNOW?

Q. DID YOU ASK HIM? DID YOU ASK HIM TO EXPLAIN THE DISCREPANCY BETWEEN THE EVIDENCE THAT IS SHOWING UP IN ONE CASE AND THE EVIDENCE THAT IS SHOWING UP IN ANOTHER?

A. I THINK SO.

Q. WHAT WAS HIS RESPONSE?

A. I THINK IT WAS TO THE EXTENT THAT HE – IT DIDN'T -- HE DIDN'T PUT 2 AND 2 TOGETHER; THAT HE'S GOT A LARGE CASELOAD. HE'S MOVING A LOT OF DISCOVERY AND – YOU KNOW. BUT I'M NOT SURE THAT HE SAID THAT OR IF I'M PUTTING WORDS IN HIS MOUTH OR SOMETHING LIKE THAT.

Q. WELL, YOU MUST HAVE BEEN FOCUSED ON THAT. RIGHT? THAT'S A BIG FOCUS IN THE MOTION BESIDES FOR THE DEKRAAI MATTER IS THIS DISCUSSION ABOUT VEGA AND WHY HE SEEMINGLY WAS MISLEADING COUNSEL WITH REGARD TO DISCOVERY. WOULD YOU AGREE THAT THAT WAS A PRETTY SUBSTANTIVE PART OF THE MOTION?

A. IT'S A PRETTY SUBSTANTIVE PART OF THE MOTION. WHETHER I WAS FOCUSED ON THAT WHEN I WAS TALKING TO HIM, I DON'T KNOW THAT I WAS.  Pages 61-63of Exhibit E.

And on pages 80-81, 82 of Exhibit E:

Q. ALL RIGHT. LET ME BREAK IT DOWN. DID YOU ASK HIM WHY HE HAD ONLY FOUR PAGES OF NOTES?

A. I BELIEVE SO.

Q. WHY HE -- WHAT DID HE SAY?

A. THAT WAS ALL HE WAS GIVEN BY THE FEDERAL TASK FORCE.

Q. DID YOU THINK THAT WAS REASONABLE THAT THE FEDERAL TASK FORCE GAVE HIM THE FOUR PAGES OF ONE OF THE CONFESSIONS THAT OSCAR MORIEL OBTAINED; OF THE DOZENS, THAT THE FEDERAL TASK FORCE SOMEHOW SELECTED FOR HIM THAT ONE REPORT?

A. YES.

Q. DID YOU THINK THAT WAS REASONABLE?

A. YES.

Q. WHY?

A. I'VE HAD EXPERIENCE WITH THE FEDERAL GOVERNMENT BEFORE.

Q. WHAT DOES THAT MEAN?

A. THAT MEANS THEY'RE INCREDIBLY PROTECTIVE OF THEIR INFORMATION AND THAT THEY'RE SOMETIMES I WOULD EVEN SAY ARROGANT WITH REGARD TO STATE CASES AND EVEN STATE COURTS. SO I'VE HAD EXPERIENCE WITH A FEDERAL LAWYER COMING BEFORE A STATE COURT AND SAYING, "JUDGE, WE REALLY DON'T CARE IF YOU ORDER IT OR NOT 'CAUSE YOU CAN'T AND WE'RE NOT GOING TO GIVE IT TO YOU," AND THINKING TO MYSELF I WOULD NEVER SAY THAT TO ANY COURT REGARDLESS OF IF IT WASN'T A COURT I PRACTICED IN. SO THAT'S SOME OF MY EXPERIENCE WITH -- WITH THE ABILITY OF A STATE COURT PROSECUTOR TO GET FEDERAL INFORMATION FROM A FEDERAL AGENCY.  Pages 80-81.

Q. WELL, WHEN YOU WANTED TO -- WHEN YOU DECIDED THATYOU WOULD RELEASE THE MORIEL DISCOVERY TO US, YOU DIDN'T GO TO THE FEDERAL GOVERNMENT. YOU WENT TO WHOM?

Motion to Disclose Grand Jury Materials

A. YES, WE WENT TO SETH TUNSTALL.

Q. SETH TUNSTALL FROM THE SPECIAL HANDLING UNIT WITH THE SHERIFF'S DEPARTMENT?

A.   HE'S ALSO PART OF THE TASK FORCE.  Page 82.

WAGNER concedes that regarding the *gang* related cases (not DEKRAAI and other high profile State murder cases; gang cases means the Black Flag cases), DEKRAAI has made some "excellent" points:

Q. OKAY. UNTRUE, UNFOUNDED, AND SCURRILOUS. CORRECT?

A. FRANKLY, YES.

Q. THAT'S YOUR VIEW OF THE ALLEGATIONS AS YOU SIT HERE TODAY. CORRECT?

A. WELL, I MEAN THERE'S A NUMBER OF ALLEGATIONS. SO THERE'S SOME ALLEGATIONS THAT I DON'T HAVE THAT VIEW OF.

Q. WHAT ALLEGATIONS ARE THOSE?

A. I THINK THAT WITH RESPECT TO SOME OF THE GANG-RELATED CASES, THAT YOU'VE MADE -- YOU'VE ACTUALLY BROUGHT TO OUR ATTENTION SOME EXCELLENT POINTS. AND I THINK THAT THERE'S A PROCESS IN THE WORKS THAT MAY RESULT IN SOME NOTIFICATION TO SOME DEFENDANTS FROM THOSE CASES, POST-CONVICTION, THAT THERE'S SOME EVIDENCE THAT THEY SHOULD BE AWARE OF FOR THE PURPOSES OF WHETHER THEY WANT TO BRING SOME POST-CONVICTION HEARINGS, SUCH AS HABEAS CORPUS. Page 7-8 of Exhibit E.

The following testimony of OCDA PETERSEN is instructive on possible Brady violations:

Q. SO -- 'CAUSE YOU'VE BEEN TALKING A LITTLE BIT ABOUT THE ROLE OF THE OFFICER WITH WHOM YOU WORK IN MAKING SURE THAT DISCOVERY TAKES PLACE, SO I IMAGINE THAT'S ONE OF THOSE AREAS THAT YOU WOULD WANT TO GET TO THE BOTTOM OF, RIGHT?

A. I BELIEVE THAT'S WHAT'S GOING ON IN THIS CASE.

Q. WELL, WE'RE NOT YOUR INVESTIGATING AGENCY SO IT'S -- YOU'RE ULTIMATELY THE ONE RESPONSIBLE FOR THAT, RIGHT?

A. CORRECT. I THINK WE'RE GETTING TO THE BOTTOM OF IT THOUGH.

Q. OKAY. AND WHAT'S YOUR -- WHERE ARE WE AT?

A. WELL, THERE'S INFORMATION THAT'S COME TO LIGHT THAT WE HAVE NOW LEARNED THAT THERE ARE CERTAIN INDIVIDUALS OR THERE WERE CERTAIN INDIVIDUALS WHO ARE ACTING AS THE GATEKEEPER, NAMELY NOW SITTING SUPERIOR COURT JUDGE, AT THE TIME AUSA TERRI FLYNN. THAT'S INFORMATION THAT I'VE SINCE LEARN. AT THE TIME SHE WOULD DICTATE WHAT INFORMATION WAS TURNED OVER AND WHAT WASN'T. SPECIFICALLY I BELIEVE IN THE VEGA CASE SHE TOLD DEPUTY SETH TUNSTALL WHAT COULD BE TURNED OVER.[7]  Page 50 of Exhibit G.

### b.)   Failure to Disclose Backgrounds of Informants and Benefits Given to Informants is Sufficient Grounds to Dismiss the Indictment

In DEKRAAI, it is disclosed that informants PEREZ and MORIEL, have incredibly violent histories, including MORIEL being involved in the commission of six murders. Additionally they received several benefits for their testimony and cooperation. If either of these informants testified, or were relied upon by other witnesses, and the Grand Jury was not informed of their violent and extensive criminal histories, or benefits received, this failure to provide potential exculpatory evidence would be misconduct. Additionally, if the prosecution not only failed to present exculpatory evidence to the grand jury, but also mislead them into believing that no such evidence existed, then the prosecution has undermined the independence of the grand jury in making an informed determination of probable cause. See *United States v. Sears, Roebuck & Co., Inc*., 719 F.2d 1386, 1392 (9th Cir. 1983).

---

[7] Testimony of OCDA PETERSEN from 4-23-14 attached as Exhibit G.

Motion to Disclose Grand Jury Materials

## 2.  THE NEED FOR DISCLOSURE OUTWEIGHS THE NEED FOR SECRECY

The indictment in this case was filed almost three years ago.  Therefore, the interests in secrecy are measurably reduced since the grand jury has long since completed its investigation. *Douglas Oil*, 441 U.S. at 222.  Additionally, the hearing in DEKRAAI has garnered much press attention.  Most likely, the witnesses that testified before the grand jury in this case testified (or will be testifying) in DEKRAAI.  Their identities and testimony are now public record.  Consequently, the need for secrecy (if there is any) is vastly outweighed by the significant potential violations of due process.

## 3.  THIS REQUEST IS STRUCTURED TO COVER ONLY THE MATERIALS NEEDED

RYE moves the Court for an order to disclose the following grand jury materials:

1. Transcripts of the witnesses who testified who are either informants or members of the SAGTF;

2.  Instructions, prosecution argument or other commentary provided to the grand jury regarding the charges;

3.  Documents or statements provided by the United States Attorney's Office to the grand jury regarding criminal histories of informants who testified or were relied upon by experts or witnesses of the SAGTF.

This request is tailored to discover only that which relates to potential due process violations.  It is anticipated that the Government will argue that they are only required to disclose grand jury witness testimony if the witness is going to be called at trial.  That response is inadequate for several reasons.  First, turning over only those witnesses the Government intends to call is insufficient to allow defendant to ascertain whether due process violations occurred. Second, there would be insufficient time to make any

assessment.  As stated above, the motion filed by DEKRAAI, is 507 pages with over 22,000 pages of discovery.  There are over 30 days of testimony.  All of this would need to be analyzed against the vast amounts of discovery that has been provided by the Government in this case.

In *United States v. Mechanik*, 475 U.S. 66 (1986), the U.S. Supreme Court held that any grand jury abuse or prosecutorial misconduct concerning the grand jury is rendered harmless by a subsequent conviction of the defendant by the petit jury. *Mechanik*, 475 U.S. at 67. The Ninth Circuit has held that the *Mechanik* holding applies to virtually any claim of grand jury abuse. *United States v. Dederich*, 825 F.2d 1317 (9th Cir. 1987); *United States v. Benjamin,* 812 F.2d 548 (9th Cir. 1987). Thus, any matters concerning abuse of the grand jury process must be fully litigated pretrial.  Consequently, defendant needs to have the requested grand jury materials now, not 30 days prior to trial.

All defense counsel in this case are buried in discovery.  Having the Grand Jury materials sufficiently in advance would also be cost effective.  The discovery provided is massive and not in any sort of logical order.  The Grand Jury material would allow defense counsel to more narrowly focus.

## CONCLUSION

For all of the above reasons disclosure of the requested Grand Jury materials is legally mandated. Additionally, it would be cost effective.

Motion to Disclose Grand Jury Materials

**DECLARATION OF MARRI DERBY**

I, Marri Derby, hereby state and declare the following:

1. I am an attorney licensed to practice law in the State of California and admitted to practice law in the Central District to California. I have been appointed by the Court to represent Tyrone Rye in this matter.

2. I have reviewed the Motion to Dismiss the Death Penalty filed by DEKRAAI. It consists of 507 pages. I have not received, nor reviewed the 22,000 pages of exhibits filed along with the motion.

3. I have received the transcripts of the following witnesses who have testified in DEKRAAI: OCDA's Dan Wagner, Erik Petersen, Jon Anderson, and Susan Schroeder; and informants Oscar Moriel and Fernando Perez. I have reviewed some of this testimony. I am in the process of obtaining additional witness testimony.

4. The discovery in RYE is exceptionally voluminous. It contains according to various estimates approximately 50,000 pages of electronic discovery and 121,000 audio recordings. The discovery has been provided on two hard drives. The discovery is not presented in a logical order (that either I or the assigned paralegal, Cynthia Lee, can decipher). The bate stamps are neither chronological nor continuous and the reports relating to pieces of evidence are not located together.

5. On December 13, 2013 I attended a seminar for all new CJA panel members and mentees. The Honorable Dale Fischer, District Judge for the Central District of

Motion to Disclose Grand Jury Materials

the United States, was one of the presenters.  It was made very clear by Judge
Fischer that we should be very cognizant of our duty to protect taxpayer funds.


I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct to the best of my knowledge.


Executed on this 27th day of May, 2014, at Newport Beach, California.

*Marri Derby*
_____
MARRI DERBY
Attorney at Law

Motion to Disclose Grand Jury Materials